FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

03 MAR 11  AM 10: 31

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| JENNIFER SNEED, | } |
| Plaintiff, | } |
| vs. | } CASE NO. CV 01-B-0548-NW |
| CITY OF FLORENCE BOARD OF EDUCATION, | } |
| Defendant. | } |

ENTERED
MAR 11 2003

### MEMORANDUM OPINION

Currently before the court is a Motion for Summary Judgment filed by defendant, City of Florence Board of Education ("defendant" or "Board"). Plaintiff, Jennifer Sneed ("plaintiff" or "Sneed"), an African-American female, alleges the Board terminated her because of her race and her gender, in violation of Title VII of the Civil Rights Act of 1964, as amended, and 42 U.S.C. § 1981.[1] Sneed also contends that she was subjected to a hostile work environment.[2] Also before the court is a Motion to Strike filed by defendant, requesting the court strike the affidavit of plaintiff and Plaintiff's Exhibit Two, a document concerning the plaintiff alleged written by Dr. Wayne Stanley. Upon consideration of the record, the submissions of the parties, the argument of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary

---

[1] Plaintiff's complaint fails to properly set forth her claims based on sex discrimination pursuant to the requirements of Fed. R. Civ. P. 8(a). Although the plaintiff has argued in her brief and at the motion for summary judgment hearing that she was also discriminated against based on her gender, plaintiff mentions only race discrimination in her Complaint. (See Compl. ¶¶ 9-17.) In addition, plaintiff's EEOC charge included only complaints of race discrimination. (Id. ¶ 8.) Although plaintiff's claims based on gender discrimination/hostile environment are not properly before it, the court will nevertheless address these claims in this opinion.

[2] See supra note 1.

Judgment and defendant's Motion to Strike certain portions of plaintiff's affidavit are due to be granted, and defendant's Motion to Strike Plaintiff's Exhibit Two is denied.

## I. FACTUAL SUMMARY[3]

After interviewing with Shirley Coker ("Coker"), the principal of Harlan Elementary School ("Harlan"), Sneed was hired as custodian at Harlan, and worked there from February 11, 1998 until she was terminated in May of 2000. (Sneed Dep. at 47; Coker Aff. ¶ 13.)[4] While school was in session, Sneed worked the night shift, from 2:00 p.m. to 10:00 p.m. (Sneed Dep. at 53.) As custodian, her duties included upkeep of certain parts of the premises at Harlan, both inside and outside the building itself. (Sneed Dep. at 88-89, 98.) Sneed's outside-duties included mowing the grass and weed-eating.[5] (*Id.* at 98.) She worked alongside James Cole ("Cole"), another custodian hired at approximately the same time as plaintiff, (Sneed Dep. at 44; Cole Aff. ¶ 1), and John Belk ("Belk"), the head custodian, (Belk Aff. at 1; Coker Aff. ¶ 1). Sneed, Cole and Belk divided the custodial work among themselves. (Belk Aff. ¶ 3; Cole Aff. ¶ 2; Sneed Dep. at 88-89, 98.)

Shortly after Sneed started at Harlan, Coker called plaintiff and Cole to her office, intending to give them the security code to the building. (Sneed Dep. at 47-49.) Before Coker

---

[3]Although some statements of fact are disputed, the evidence is cited in the light most favorable to plaintiff, the non-moving party, and all reasonable inferences from admissible evidence are drawn in favor of plaintiff. *See, e.g., Patrick v. Floyd Med. Ctr.,* 201 F.3d 1313, 1315 (11th Cir. 2000).

[4]At the time of her termination, Sneed was a probationary employee. (Coker Aff. ¶13.)

[5]During her interview, Coker informed Sneed that the she would have to perform yard work as custodian. (Sneed Dep. at 41-42; Coker Aff. at ¶1.) Sneed told Coker she could do the yardwork. (Sneed Dep. at 41-42; Coker Aff. at ¶1.)

2

could do this, however, Sneed walked out of the office. (*Id.*) Sneed claims she walked out because Cole signaled to Coker, by nodding his head and clearing this throat, that she should not give the security code to Sneed. (*Id.*) Sneed did not thereafter ask Coker for the security code or complain to Coker about not being given the code. (*Id.* at 59-61; Coker Aff. ¶ 2.) Sneed admitted, however, that there was never an occasion when she needed to get into the school and could not because she did not have the security code. (Sneed Dep. at 63). Either the building was open when she arrived to work her normal shift at 2:00 p.m., (*id.* at 53, 63), or, if the custodians worked while school was not in session, Belk or Cole let her in the building, (*id.* at 53-54, 63).

Sneed complained to Coker about Belk yelling at her on several occasions. (*Id.* at 64-68; Coker Aff. ¶¶ 3-4.) For example, Sneed complained when Belk got angry at her after she ran over a rock while she was using the riding lawnmower. (Sneed Dep. at 68; Belk Aff. ¶ 2.) Sneed and Belk met with Coker about this incident and Coker told them that she expected them to try to get along, (Sneed Dep. at 69; Belk Aff. ¶ 2), and that she expected them to work together as a team to keep the school clean for their students, (Coker Dep. at 41; Coker Aff. ¶ 3). Coker also told Belk to talk to Sneed in a more respectful manner, and Belk said he would. (Coker Aff. ¶¶ 3-4; Belk Aff. ¶ 2.)

Sneed recalled an occasion when she called Coker at home and said she didn't "know how to take Mr. Belk . . . (and didn't) understand him." (Sneed Dep. at 75-76.) According to Sneed, this call occurred after Belk yelled and cursed at her and told her she was not doing anything. (*Id.* at 76.) Coker spoke with Belk about this incident. (*Id.*) Shortly thereafter, Coker asked Sneed if she wanted to transfer to an open position at Weeden or Brandon Elementary

3

since she was not happy at Harlan. (Sneed Dep. at 77; Coker Dep. at 30.) Sneed said she did not want to transfer. (Sneed Dep. at 78.)

Sneed also complained to Coker after she overheard Belk telling Cole that Sneed "wasn't doing a damn thing." (Sneed Dep. at 70.) Sneed told them, "I'm tired of you all prejudiced people. I'm sick of you." (*Id.*). Sneed says they later met with Coker because Cole and Belk were offended that Sneed called them prejudiced. (*Id.* at 71-72). Coker recalled that Sneed was upset that Belk and Cole were talking about her behind her back. (Coker Aff. ¶ 5.) Coker asked Cole and Belk whether they had talked about Sneed in a derogatory or negative manner. (*Id.*) Belk said they had not talked about Sneed in an ugly manner and had just been talking about an area of the grass that had been missed by Sneed. (*Id.*) Belk told Coker that Sneed came into the room when he and Cole were talking and stated in a loud and offensive tone that they had no right to be talking about her behind her back. (*Id.*) Cole confirmed this story. (*Id.*) Coker told Cole and Belk that they should not make derogatory remarks to Sneed or about her. (*Id.*)

Sneed testified that she once overheard Belk use the term "coon dog" and she felt that this was a racial slur. (*Id.* at 104-105.) However, Sneed did not tell Coker that Belk used this term. (*Id.*) Sneed also testified that she had heard Belk use the term "bitch," but not directed to her. (*Id.* at 106.) Sneed never told Belk that this offended her. (*Id.*) Sneed never told Coker that Belk used the term "bitch" or that it offended her. (*Id.* at 107.)

Sneed never told Coker that she felt that Belk and Cole treated her differently or in a negative manner because she was black, or because she was a female. (Coker Aff. ¶ 7.) Sneed never told Coker that Belk or Cole used any language that offended her because of her race or

4

gender. (*Id.* ¶ 6.) Sneed never heard Coker make any racial or gender-related comments. (Sneed Dep. at 113, 124.)

Sneed also contends that the division of responsibilities with regard to the areas inside Harlan Elementary building was unfair; however, Sneed never complained to Coker about the assignment of responsibilities. (Sneed Dep. at 88-89; Coker Aff. ¶ 8.) In fact, Coker testified that there was an occasion when she even asked the custodians about the division of work, and they reported no problems. (Coker Dep. at 41-42.)

Coker testified that Belk and Cole were good workers. (*Id.* at 24.) Coker also thought that Sneed did a good job as far as her duties as custodian *inside* Harlan. (*Id.* at 25.) However, Coker received complaints from Belk and Cole regarding Sneed's work outside in the yard area. (*Id.* at 25-26; Coker Aff. ¶ 4.) Coker also personally observed that Sneed was not doing her fair share of the outside work. (Coker Aff. ¶ 8.) She often saw Sneed standing around outside, or talking to neighbors of the school, during work hours when she was supposed to be doing yard work. (*Id.*) Coker instructed Belk and Cole to assist Sneed as much as possible in using equipment outside. (Coker Dep. at 26-27.) On two occasions, Coker observed Cole and Belk helping Sneed. (*Id.*)

Belk told Coker that Sneed would not speak to him or Cole, and that she would have nothing to do with them. (Coker Dep. at 29.) Coker testified concerning an occasion when she invited the custodians to go to a fish dinner during AEA break. (Coker Aff. ¶ 7.) Sneed told Coker that she would not sit down and eat with people (Belk and Cole) who did not like her. (*Id.*) Sneed never said that she thought Belk and Cole did not like her because she was black, or because she was female. (*Id.*)

5

In the spring of 2000, Coker decided that it would be best for the school if Sneed did not return as a custodian the following school year. (Coker Aff. ¶ 11.) Dr. Edison Barney ("Barney") was the superintendent for Florence City Schools during the period when Sneed worked at Harlan. (Barney Dep. at 10.) Barney was responsible for making recommendations to the Board regarding the hiring and firing of employees. (*Id.*) The Board votes "yes" or "no" on the superintendent's recommendation. (*See Ala. Code* § 16-12-16; *Ala. Code* § 16-24-1, *et seq.*) Coker talked with Barney about her decision not to recommend that Sneed's contract as a custodian be renewed for the 2000-2001 school year. (Barney Dep. at 22-24; Coker Aff. ¶ 11.) Coker told Barney that Sneed was not doing her fair share of the outside work and could not get along with her co-workers. (Barney Dep. at 24.) Barney asked Coker if she had spoken with Sneed about this and Coker told him she had. (Coker Aff. ¶ 11.) Barney said that if Sneed was not working as a team member, "it would be best to non-renew her." (Coker Dep. at 34.)

Coker met with Sneed on May 8, 2000, and told Sneed it was her recommendation that Sneed's contract as custodian at Harlan not be renewed for the 2000-2001 school year. (Coker Dep. at 32-35; Sneed Dep. at 136-137.) Coker told Sneed that her reason for this recommendation was that she felt Sneed had a hard time doing the outside work to the expectations that were required and had problems getting along with co-workers. (Sneed Dep. at 137.) Additionally, Coker indicated, in a report, that Sneed had a large number of absences. (Ex. 3, Coker Dep., Performance Rating Report for Jennifer Sneed of 5/08/00.) However, Coker said her decision to recommend that Sneed's contract not be renewed was based primarily on Sneed's failure to perform the outside work well and her inability to get along with co-workers. (Coker Aff. ¶ 12; *see also* Ex. 3, Coker Dep., Performance Rating Report for Jennifer Sneed of 5/08/00.)

Barney, in his deposition, did not recall that Sneed had a problem with absences from work. (Barney Dep. at 24.)

On May 22, 2000, the Board voted to non-renew Sneed's employment contract as a custodian at Harlan, effective July 1, 2000. (Coker Aff. ¶ 13.) Londa Perkins, a black male, was hired on July 12, 2000 to replace Sneed. (Coker Aff. ¶ 14.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III. DISCUSSION

### A. Disparate Treatment Claims - Title VII and § 1981

Sneed alleges that the Board violated Title VII, and § 1981, by terminating her because she is an African-American female.[6] In any action alleging disparate treatment by an employer, the plaintiff must prove that the employer acted with a discriminatory motive. *International Bd. of Teamsters v. United States,* 431 U.S. 324, 335 n.15 (1977). To establish a prima facie case of discrimination, a plaintiff may employ direct evidence of discriminatory intent, statistical proof of a pattern of discrimination, or circumstantial evidence. *Verbraeken v. Westinghouse Elec. Corp.,* 881 F.2d 1041, 1045 (11th Cir. 1989).

In the absence of direct evidence of discrimination, like here, the plaintiff must proceed under the framework established in *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973) and refined in *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248 (1981).[7] First, a plaintiff must carry the initial burden by establishing a prima facie case of discrimination by proof of the following: (1) membership in a protected class, (2) qualification for the position held, (3) termination, (4) and replacement with a person outside the protected class. *Walker v. Nations Bank of Fla.,* 53 F.3d 1548, 1556 (11th Cir. 1995) (citing *Rollins v. TechSOUTH, Inc.,* 833 F.2d 1525, 1532 n. 14 (11th Cir. 1987).

---

[6]Section 1981 prohibits race discrimination in the making and enforcement of contracts. 42 U.S.C. § 1981(a). Although Sneed makes no distinction between her § 1981 claims and Title VII claims, only Sneed's claims of racial discrimination are actionable under § 1981. *See Runyon v. McCrary,* 427 U.S. 160, 167 (1976); *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 459 (1975); *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 436 (1968).

[7]The elements of a prima facie case are the same under Title VII and § 1981. *Standard v. A.B.E.L. Servs. Inc.,* 161 F.3d 1318, 1330 (11th Cir. 1998).

8

When, or if, a plaintiff makes out a prima facie case, "[t]he burden . . . shift[s] to the employer to articulate[, but not prove]<sup>8</sup> some legitimate, non-discriminatory reason [for the contested employment decision]." *McDonnell-Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 253. Once the defendant meets its burden of articulating a legitimate, non-discriminatory reason for the employment decision, the inference raised by the prima facie case is rebutted and dropped from the case. *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993). The case may continue only if the plaintiff presents some evidence sufficient to permit a reasonable fact finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision and, instead, were "pretextual." *Burdine*, 450 U.S. at 255-56; *Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997). Proof of "pretext" usually turns on the plaintiff's ability to produce comparative, statistical or direct evidence of discriminatory motive. *See Miles v. M.N.C. Corp.*, 750 F.2d 867, 870-875 (11th Cir. 1985). "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [a defendant] has offered extensive evidence of legitimate, non-discriminatory reasons for its actions." *Young v. General Foods Corp.*, 840 F.3d 825, 830 (11th Cir. 1988) (quoting *Celotex Corp.*, 477 U.S. at 322-325).

---

<sup>8</sup> *See, e.g., Burdine*, 450 U.S. at 254 ("The defendant need not persuade the Court that it was actually motivated by the proffered reasons."); *Howard v. BP Oil Co.*, 32 F.3d 520, 524 (11th Cir. 1994) (stating that defendant's burden is "easily fulfilled").

1.  **Prima Facie Case**[9]

With respect to the race claim, defendant concedes that Sneed is a member of a protected class, was qualified for her position, and was terminated. However, Sneed cannot prove the fourth element of her prima facie case, that she was replaced by a person outside her protected class. Sneed was replaced by Londa Perkins, who, like plaintiff, is African-American. Therefore, the court finds Sneed has not established her prima facie case of disparate treatment based on race.

Defendant correctly notes that Sneed has not adequately set forth in her complaint a claim for disparate treatment based on gender. However, defendant concedes that plaintiff would otherwise have established her prima facie case of disparate treatment based on sex.

2.  **Legitimate, Non-Discriminatory Reasons for Termination**

Even assuming a prima facie case of race and gender discrimination, defendant has articulated legitimate, non-discriminatory reasons in support of its decision to non-renew Sneed's employment contract. Coker recommended non-renewal to Barney, the superintendent, because she believed plaintiff was not performing the yard work at Harlan to her satisfaction and did not appear willing to do so, and because plaintiff could not get along with co-workers. These reasons are supported by statements from Belk and Cole, as well as Coker's own observations. In a form she filled out and forwarded to Barney, Coker also indicated that Sneed was absent thirty-one times. (Ex. 3, Coker Dep., Performance Rating Report for Jennifer Sneed of 5/08/00.) The

---

[9]Termination is the only discrete act of discrimination alleged by plaintiff that would have affected the terms and conditions of her employment. Plaintiff does not offer sufficient evidence of other events, individually or collectively, that could give rise to a claim of disparate treatment under Title VII and § 1981.

Board ultimately voted to non-renew Sneed's employment contract based on Barney's recommendation, (*see, e.g.*, Hughes Dep. at 11-12), which he based on Coker's recommendation to him, (Barney Dep. at 24, 27-29.)

The failure to adequately perform one's duties, and the inability to "get along" with co-workers are certainly legitimate non-discriminatory reasons for termination. Therefore, the court finds defendant has met its burden of production.

3.  **Plaintiff's Evidence of Pretext**

Plaintiff does not present sufficient evidence to permit a reasonable fact finder to conclude that the defendant's articulated reasons, the ones stated by Coker and effectively adopted by Barney and then the Board, were not the real reasons for the non-renewal of Sneed's employment contract.

Although plaintiff contends that Coker lied when she indicated in a performance evaluation that Sneed had been absent thirty-one times, Coker testified that Sneed's failure to adequately perform the outside work, and her inability to "get along" with co-workers were the main reasons she recommended non-renewal. In his deposition, Barney testified regarding a discussion he had with Coker about her reasons for the recommendation. (Barney Dep. at 23-24.) He did not indicate that Coker mentioned Sneed's absences during this conversation. (*Id.*)

In her opposition brief, plaintiff does not respond to, much less contest, the accuracy of Coker's other articulated reasons. Instead, plaintiff attempts to establish pretext by recounting situations when others allegedly discriminated against her. For example, she claims Coker discriminated against her by not giving her the security code during a meeting that took place shortly after Sneed started. In addition, she complains that Belk and Cole, her co-workers, yelled

11

at her and used words like "coon dog" and "bitch."[10]  This evidence does not establish that Coker's articulated reasons were a mere pretext for discrimination.

Coker recommended the non-renewal of Sneed's employment contract to Barney because of Sneed's unsatisfactory performance of yard work and her inability to get along with her co-workers.  Although Belk and Cole provided some information to Coker regarding Sneed's unwillingness to perform yard work, Coker also personally observed Sneed's insufficient performance.  (Coker Aff. ¶ 8.)  Coker was also personally aware of Sneed's refusal to get along with her co-workers.

"Title VII was not intended to diminish traditional management prerogatives," *Burdine*, 450 U.S. at 259, and this court does not sit as a "super-personnel department" second-guessing decisions made by the employer when they are not motivated by race or gender.  *See Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000).  Even if Coker's evaluation of Sneed's absences, and her willingness to perform outside yard work and get along with her co-workers was mistaken, this alone would not constitute evidence of pretext.  *Id.*; *see also More v. Sears, Roebuck & Company*, 683 F.2d 1321, 1323 n.4 (11th Cir. 1982) (stating that employer's good faith belief that the plaintiff's work performance was unsatisfactory is not pretext, even if the employer is incorrect.).

Plaintiff offers no evidence that Coker, who is female, was prejudiced against African-Americans, females, or the plaintiff.  In fact, plaintiff testified that she did not hear Coker make

---

[10]Sneed testified that Belk and Cole did not refer to her as a "coon dog" and a "bitch."  (Sneed Dep. at 104-06.)  She stated that she overheard them using those terms.  (*Id.*)

12

any derogatory racial or gender-related comments. (Sneed Dep. at 113-24.) Also, Coker spoke with Belk and Cole on multiple occasions, advising them to treat Sneed with more respect.

Furthermore, Sneed has not specifically alleged, nor does the record support a finding, that the Board or Barney were motivated by discriminatory intent in non-renewing Sneed's employment contract. Indeed, there is no evidence that the members of the Board harbored any racist or sexist intent. The Board's decision to non-renew Sneed was based upon the recommendation of Barney, and there is no evidence that Barney was influenced by racist or sexist motives. In fact, the Board hired Londa Perkins, an African-American, to replace Sneed.

Plaintiff's conclusory allegations that she felt discriminated do not establish, or provide a reasonable fact finder the evidentiary basis to find, that defendant's articulated reasons for Sneed's non-renewal were a mere pretext for discrimination. Absent such evidence creating a genuine issue of material fact, the court is of the opinion that defendant's motion for summary judgment on plaintiff's disparate treatment claims based on racial and sexual discrimination is due to be granted.

**B. Hostile Environment – Title VII and § 1981**

Sneed also alleges she was subject to a hostile environment at Harlan. To maintain a hostile environment claim under Title VII or § 1981,[11] the plaintiff must first establish her prima facie case by showing: (1) she belongs to a protected group; (2) she has been subjected to unwelcome harassment; (3) the harassment was based on her race or her sex; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment and

---

[11]The elements of a prima facie case are the same under Title VII and § 1981. *Standard v. A.B.E.L. Servs. Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

create an abusive working environment; and (5) a basis for holding the employer liable. *See Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002); *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999).

The fourth element of prima facie case includes both an objective and subjective component. *Mendoza*, 195 F.3d at 1246. For purposes of this motion, the court will accept that Sneed subjectively perceived her environment as hostile. Therefore, the court will focus on whether a reasonable person would have found the work environment sufficiently hostile and abusive to alter the terms and conditions of her employment. *See id.* (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)). In determining the objective severity of the harassment, the court considers: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Id.*

Sneed never heard Coker make any racially or sexually derogatory comments. Plaintiff claims she overheard Belk and/or Cole refer to her as "coon dog," and to women in general as "bitches." There is also evidence that Belk yelled at her on a few occasions about the quality of her work. Assuming this evidence to be true, the court finds these comments fall well short of that required to establish a hostile environment. *See Harris*, 510 U.S. at 21 ("When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated.) (internal citations omitted); *Edwards v. Wallace Cmty. College*, 49 F.3d 1517, 1521 (11th Cir. 1995) ("[R]acial slurs allegedly spoken by co-workers had to be so 'commonplace, overt, and denigrating that they created an atmosphere

charged with racial hostility.'") (quoting *E.E.O.C. v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068 (11th Cir. 1990). No reasonable person could find that the nature and frequency of the statements complained of are evidence of an atmosphere charged by racial or sexual hostility. Absent proof of harassment sufficiently severe and pervasive to alter the terms and conditions of her employment, Wright fails to establish her prima facie case of hostile environment.

Even if there were evidence of a hostile environment created by the comments of Belk and/or Cole, her fellow custodians, the evidence is undisputed that she never reported them to Coker, or anyone else. The Board could only be liable for a hostile environment if it had actual knowledge of the harassment, or if the alleged conduct was so "severe and pervasive as to constitute constructive knowledge." *Miller*, 277 F.3d at 1278. There is no evidence that any alleged hostile environment was ever reported to Coker, Barney or the Board, or that any information was ever imparted to them which could have arguably put them on notice of any problem at Harlan. Accordingly, the defendant is entitled to summary judgment on plaintiff's hostile environment claims.

## MOTION TO STRIKE

Defendant moves to strike Sneed's Affidavit, dated May 15, 2002, which plaintiff submitted with her opposition brief. (Pl.'s Ex. 1, Sneed Aff.) In her affidavit, plaintiff makes the following statements: "Belk and Cole called me derogatory names, like bitch and 'coon dog'. When I reported such incidents to Coker, she would say we'll have a meeting." (*Id.* ¶ 6). Upon review of the record the court is of the opinion that these statements in plaintiff's affidavit are due to be stricken.

15

"When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins and Associates, Inc. v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir. 1984). The above-cited statements contradict the following answers plaintiff gave at her deposition four months earlier on January 14, 2002:

> A. I overheard Mr. Belk mention about coon dog.
> . . .
> Q. Who was he saying that to?
> A. He was talking to James [Cole].
> Q. Did you ever ask them what he meant or talk to them about that?
> A. No.

(Sneed Dep. at 104-05),

> Q. Did he [Belk] call you that ["bitch"]?
> A. Well, he just – just women. I'm a woman.
> Q. But did he say to you, "you're a bitch" or "hey, bitch, go do this" or anything like that? Did he direct the word to you?
> A. No.
> Q. When did you hear him say it?
> A. I just would constantly throughout working, he would just call women Bs, you know, constantly. You know, just, you know, he didn't directly call –
> Q. You mean, you overheard him talking?
> A. Yeah.

(*Id.* at 106),

> Q. Did you ever go tell Ms. Coker about this statement ["coon dog"]?
> A. No.

(*Id.* at 105),

> Q. Did you ever tell her [Coker] that they [Belk and Cole] used the B word?
> A. No. I didn't come – I just told her that they talk about you, me, and everybody else. That's all I said to her.

16

(*Id.* at 107).

According to her deposition testimony, Sneed never mentioned that she heard Cole use either term. Furthermore, she clearly states that Belk did not refer to her as a "coon dog," rather she merely states that she overheard him use this term. She also indicates that Belk did not refer to her as a "bitch." Additionally, in her deposition answers, she admits that she never reported these alleged incidents to Coker. The court finds that these answers are "inherently inconsistent" with the above-cited portions of her affidavit. *See Harrison v. Bush Hog Division of Allied Prods. Corp.*, No. CA 99-0495-C, 2000 WL 726910, *19-*20 (S.D. Ala. May 22, 2000) (denying motion to strike because evidence was not "inherently consistent"). Therefore, to the extent her affidavit, in paragraph 6, contradicts her deposition testimony, the court finds that portion is due to be stricken.

Defendant also moves to strike Plaintiff's Exhibit Two, an unsigned document that appears to be a medical record concerning the plaintiff written by Dr. Wayne Stanley. The document includes the following pertinent information, "She [Sneed] feels that there is some harassment at work." This information, if believed, demonstrates that Sneed subjectively perceived her work environment as hostile. For purposes of defendant's summary judgment motion, the court has already assumed this fact to be true. (*See supra* p. 14.) The court, having effectively considered the pertinent and material portions of this document, need not grant defendant's motion to strike this evidence. Therefore, defendant's Motion to Strike Plaintiff's Exhibit Two is denied.

## IV. CONCLUSION

For the reasons stated herein, the court is of the opinion that defendant's Motion for Summary Judgment is due to be granted as to all of plaintiff's claims, defendant's Motion to Strike certain portions of plaintiff's affidavit is granted, and defendant's Motion to Strike Plaintiff's Exhibit Two is due to be denied. An Order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this 11th day of March, 2003.

_____
**SHARON LOVELACE BLACKBURN**
United States District Judge